**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**BEVERLY R. PAULEY,**

       **Plaintiff,**

**v.**                                        **Case No.: 3:16-cv-08943**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

       This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their memoranda. (ECF Nos. 12, 13).

       Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 12); **GRANT** Defendant's

request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

## I.    Procedural History

On November 28, 2011, Plaintiff Beverly R. Pauley ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of July 8, 2011 due to chronic obstructive pulmonary disease ("COPD") and emphysema. (Tr. at 418-30, 495). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 247-53, 261-74). Claimant filed a request for an administrative hearing, which was held on April 8, 2014 before the Honorable William Paxton, Administrative Law Judge ("ALJ Paxton"). (Tr. at 1-41). By written decision dated May 20, 2014, ALJ Paxton found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 216-239). Claimant appealed the decision to the Appeals Council, which inadvertently advised her by letter that she could request a new hearing, which Claimant requested. (Tr. at 241-42). Therefore, the Appeals Council remanded the case for a second administrative hearing, which was held on August 26, 2015 before the Honorable Sabrina Tilley, Administrative Law Judge (the "ALJ"). By written decision dated October 22, 2015, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 100-23). The ALJ's decision became the final decision of the Commissioner on July 25, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 75-81).

Claimant timely filed the present civil action seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 9, 10). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF

No. 12). In response, the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant filed a Reply. (ECF Nos. 13, 14). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 49 years old at the time of her alleged onset of disability and 53 years old at the time of the ALJ's decision. (Tr. at 114). She completed high school and communicates in English. (Tr. at 11, 48, 494, 496). Claimant previously worked as a child daycare provider, a printer/packer in a t-shirt factory, and a secretary for a heating and cooling company. (Tr. at 9-11, 496).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a

3

claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2014. (Tr. at

105, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 8, 2011, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "hearing loss right ear, [COPD], borderline intellectual functioning, major depressive disorder, opiod dependence, and generalized anxiety disorder." (Tr. at 105-06, Finding No. 3).

As for the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 106-08, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit six hours out of an eight-hour workday and stand and walk six hours out of an eight-hour workday. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; but never climb ladders, ropes, or scaffolds. The claimant should have no exposure to loud noises or requirements to use [the] telephone[.] She cannot tolerate exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases, poor ventilated areas or hazards. She retains the capacity to understand, remember, carry out simple, routine, repetitive task[s] with little[,] if any[,] work[-]related decision-making. She can tolerate occasional interaction with co-workers, supervisors, and [the] general public and does best in an environment free of fast-pace[d] production requirements[.]

(Tr. at 109, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of her past relevant work. (Tr. at 114, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 114-16, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1961 and was defined as a younger individual, although she

subsequently changed age category to closely approaching advanced age; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 114, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled work as a hand packer, price marker, and stocker at the light exertional level and grader/sorter, bench hand, and assembler at the sedentary exertional level. (Tr. at 115-16, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 116, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

In her single challenge to the Commissioner's decision, Claimant contends that the ALJ failed to properly analyze the severity of her COPD in assessing her RFC. (ECF No. 12 at 13). Specifically, she argues that the ALJ focused on Claimant's June 2012 pulmonary function test and failed to consider the "more severe" results of a subsequent test performed in April 2014. (*Id.* at 13-14). Claimant contends that the 2014 test and other treatment records show that her COPD worsened. (*Id.* at 14). She asserts that the ALJ's failure to consider the 2014 test is "especially egregious" because the only consultative examination in the file was performed in June 2012 and the consultative opinions assessing Claimant's RFC were completed in June and December 2012, all of which pre-dated the 2014 pulmonary function test. (*Id.*). Claimant further argues that the ALJ failed to adequately consider the impact of her COPD on her ability to walk, lift, and carry. (*Id.* at 15). Claimant emphasizes that if the ALJ had restricted

6

her to sedentary work, she would have been deemed disabled under the Grid rules.[1] (*Id.*).

In response to Claimant's arguments, the Commissioner states that Claimant has not proven that she is disabled under the Act. (ECF No. 13 at 9). Further, the Commissioner asserts that substantial evidence supports the ALJ's decision that Claimant's COPD did not result in disabling functional limitations. (*Id.* at 10). As to Claimant's pulmonary function tests, the Commissioner contends that Claimant's 2014 pulmonary function test rendered nearly identical results to one of her 2012 tests, which the ALJ explicitly discussed in the decision. (*Id.* at 11-12). Lastly, the Commissioner states that the clinical evidence does not support Claimant's argument that her COPD resulted in limitations that prevented her from performing the requirements of a limited range of light work. (*Id.* at 12-13).

In reply to the Commissioner's arguments, Claimant argues that the ALJ should not be excused from mentioning the 2014 pulmonary function test because "consistency of objective testing is a crucial factor in evaluating the severity of a claimant's impairment" and a reviewing court cannot be certain that an ALJ considered all of the objective evidence if the ALJ failed to make even passing reference to it. (ECF No. 14 at 1). Claimant asserts that it was improper for the ALJ to discredit Claimant's credibility based upon the lack of objective evidence, but then ignore "important, objective, pulmonary testing which support[ed] her testimony." (*Id.* at 1-2). Finally, Claimant again notes that no examining or reviewing source rendered an opinion after

---

[1] The Medical-Vocational Rules (the "Grids") are used at the fifth step of the sequential disability process, setting out "numbered table rules which direct conclusions of 'disabled' or 'not disabled'" when a claimant's characteristics coincide with those of a numbered rule. SSR 83-12, 1983 WL 31253, at *1 (S.S.A. 1983); *see* 20 C.F.R. Pt. 404, Subpart P, Appendix 2.

the 2014 pulmonary function test. (*Id.* at 2).

## V.    **Relevant Evidence**

The undersigned reviewed all of the evidence before the Court, including the records of Claimant's allegations and health care examinations, evaluations, and treatment. The information that is most relevant to Claimant's challenge is summarized as follows.

### A.  **Treatment Records**

On September 8, 2010, Claimant was taken by ambulance to Thomas Memorial Hospital with an abrupt onset of vomiting, lower back pain, fever, and difficulty breathing. (Tr. at 809). She was wheezing and had a history of COPD, among other conditions. (Tr. at 810, 831). Her chest x-ray showed a large right-sided lung mass that was diagnosed as pneumonia, most likely pneumococcal in etiology. (Tr. at 812, 816, 823). The computed tomography ("CT") scan of her chest showed moderate-sized bilateral pleural effusions that were larger on the right, bilateral infiltrates that were denser in the right lower lobe, and underlying emphysematous changes. (Tr. at 861). Claimant's diagnoses included septic shock, severe hypotension, respiratory failure, and pneumonia. (Tr. at 816). She was discharged from the hospital after ten days in the intensive care unit. (*Id.*). At the time of discharge, Claimant was in stable condition, was feeling much better, and her lungs were clear to auscultation. (*Id.*). She was advised to quit smoking. (*Id.*).

On September 29, 2010, Claimant had chest x-rays at Thomas Memorial Hospital due to complaints of cough and fever. She had mildly hyperexpanded lungs, but no acute pulmonary infiltrates or pleural effusions. (Tr. at 808). It was noted that there was complete resolution of the bibasilar infiltrates and/or atelectasis with small

8

bilateral pleural effusions from her prior study on September 16, 2010. (*Id.*). Claimant followed up with her primary care provider, Ashish Sheth, M.D., at WV Primary Care, the following day, on September 30, 2010. Dr. Sheth assessed Claimant with a sinus infection and minimal chest wall pain. (Tr. at 1093). Claimant exhibited scattered wheezing bilaterally, but her cardiovascular examination was normal and she had no cyanosis, clubbing, or edema of her extremities. (*Id.*). Claimant was prescribed the antibiotic Omnicef. (*Id.*). She admitted to Dr. Sheth that she continued to smoke. (*Id.*).

On November 16, 2010, Claimant saw Dr. Sheth for chest congestion. (Tr. at 1095). She reported chest pain and cough with green mucoid sputum. (*Id.*). She was again diagnosed with a sinus infection. (*Id.*). Her lungs were clear to auscultation with no audible rales or wheezes. (*Id.*). Claimant received samples of the antibiotic Avelox. (*Id.*). Two months later, on January 17, 2011, Claimant saw Dr. Sheth complaining of another sinus infection, which she stated was symptomatic for the past week. (Tr. at 1101). She had a cough, but no chest pain. (*Id.*). Her lungs were clear to auscultation with no audible rales, rhonchi, or wheezes. (*Id.*).

On March 15, 2011, Claimant presented to Kevin L. Eggleston, M.D., at Pulmonary Associates of Charleston, PLLC, following her discharge from the hospital for treatment of bilateral pneumonia. (Tr. at 623). Claimant reported that she felt well other than having exertional shortness of breath and a cough that was improving. (*Id.*). She had no decrease in normal daily activity and admitted that she continued to smoke a pack of cigarettes per day, as she had done for the past 20 years. (*Id.*). On examination, Claimant's chest appeared normal with symmetrical expansion. She had regular and unlabored breathing, without rales, rhonchi, or wheezing. (Tr. at 625). However, she did have diminished breath sounds. (*Id.*). Dr. Eggleston compared

Claimant's radiology report to a study taken on September 29, 2010. (Tr. at 626). His impression was emphysematous and interstitial changes in the lungs bilaterally with minimal areas of atelectasis or fibrosis. (*Id.*). Claimant had no definite infiltrates or changes of overt congestive heart failure. (*Id.*). Dr. Eggleston's assessment was tobacco abuse, COPD, and pneumonia. (Tr. at 625). Claimant was encouraged to quit smoking and received a prescription for nicotine patches, but stated that she did not need any inhalers for her COPD. (Tr. at 623, 625). She was told to follow up with Dr. Eggleston in three months. (Tr. at 625).

On January 9, 2012, Claimant presented to the Thomas Memorial Hospital Emergency Department following a motor vehicle collision. (Tr. at 780). Her respirations were not labored and her breath sounds were normal, but she reported mild difficulty breathing and a headache. (Tr. at 781, 783, 784). Claimant's chest x-ray showed hyperexpansion of the lungs that was seen in her previous study on March 15, 2011. (Tr. at 795). There was no acute infiltrate, consolidation, pleural effusion, or pneumothorax in her lungs. (*Id.*).

On March 19, 2012, Claimant asked Dr. Sheth to perform "blood work" because she was concerned about her symptoms of fatigue and weight loss. (Tr. at 1107). Dr. Sheth also planned to evaluate Claimant's thyroid gland via ultrasound. (*Id.*; Tr. at 1109). On examination, her lungs were clear to auscultation, her breathing was unlabored, her cardiovascular examination was normal, and she had no lower extremity edema. (*Id.*). Claimant continued to smoke cigarettes, so she was again counseled to stop smoking. (*Id.*).

Claimant followed up with Dr. Sheth regarding her blood work and thyroid ultrasound on April 5, 2012. (Tr. at 1114). She was referred to a surgeon for a thyroid

nodule. (*Id.*). Her lungs were clear to auscultation with no audible rales or wheezes. (*Id.*). However, she continued to smoke every day. (*Id.*).

On April 11, 2012, Claimant saw Dr. Eggleston for a routine follow-up appointment regarding COPD. (Tr. at 618, 620). Claimant complained of frequent coughing and wheezing, but had no change in normal daily activities. (Tr. at 618). She stated that she believed her brother had Alpha-1 for which he received weekly infusions.[2] Claimant continued to smoke a pack of cigarettes per day. (Tr. at 619). Her chest was normal in appearance with symmetrical expansion; her breathing was regular and unlabored; and she had no rales. (Tr. at 620). However, she had diminished breath sounds, mild rhonchi, and mild wheezing. (*Id.*). Dr. Eggleston diagnosed Claimant with tobacco abuse, moderate/severe COPD, and pneumonia. (*Id.*). She was prescribed a Symbicort inhaler to use twice per day and was advised to cease smoking, particularly if she had Alpha-1. (Tr. at 620). She was given samples of Symbicort because she was currently applying for Medicaid. (*Id.*). Claimant agreed to obtain nicotine patches to help her cease smoking through the "quit line." (*Id.*).

Dr. Eggleston gave Claimant a spirometry pulmonary function test during her visit on April 11, 2012. The results showed a forced vital capacity (FVC) [3] score of 2.29 liters (72% of predicted value) prior to the administration of a bronchodilator and 2.56

---

[2] Alpha-1 Antitrypsin Deficiency (Alpha-1) is a genetic condition that may result in serious lung disease in adults and/or liver disease at any age. https://www.alpha1.org/What-is-Alpha1

[3] The FVC score measures lung size (in liters) and represents the volume of air in the lungs that can be exhaled following a deep inhalation. The FVC measurements for a given individual are compared to predicted values, which are based on healthy individuals with normal lung function and indicates would be expected for someone of the same sex, age and height. Interpretations of spirometry results require comparison between an individual's measured value and the predicted value. If the FVC is within 80% of the predicted value, the results are considered normal; mild results are 70-79%, moderate results are 60-69%, and severe results are less than 60%. http://www.worker-health.org/breathingtestresults.html

liters (81% of the predicted value) after administration of the drug. (Tr. at 621). Her forced expiratory volume-one second (FEV1)[4] score was 1.29 liters (less than 51% of the predicted value) prior to administration of the drug and 1.39 liters (less than 55% of the predicted value) after administration of the drug. (*Id.*). Finally, her pre-drug FEV1/FVC[5]  was 56.50 liters (less than 70% of the predicted value) and 54.44 liters post-drug (less than 68% of the predicted value). (*Id.*). Dr. Eggleston stated that the results showed "severe obstruction." (*Id.*).

On May 13, 2012, Claimant was admitted to Thomas Memorial Hospital following an intentional drug overdose of Unisom sleeping pills. (Tr. at 743). She denied having any chest pain, cough, or difficulty breathing. (*Id.*). On examination, Claimant had no respiratory distress and normal breath sounds. (Tr. at 744). Her radiology report showed mild chronic interstitial lung disease with no acute pulmonary infiltrates. (Tr. at 746). There was no change as compared to her x-ray taken on January 9, 2012. (*Id.*). At the time of her transfer to the Behavioral Medicine department a few days later, Claimant's lungs were clear to auscultation with no audible rales or wheezes. (Tr. at 757).

On November 26, 2012, Claimant saw Dr. Sheth for another sinus infection. (Tr. at 1123). Her lungs were clear on examination. (*Id.*). She was prescribed an antibiotic and advised that she should drink fluids and could take Claritin and over-the-counter nonsteroidal anti-inflammatory drugs as needed for inflammation. (*Id.*). She was once

---

[4] FEV1 score measures how much air can be exhaled in one second following a deep inhalation. As with FVC scores, 80% or greater of predicted value is considered normal, while 70-79% is mild abnormality, 60-69% is moderate abnormality, and less than 60% is severe abnormality. *Id.*

[5] The FEV1/FVC score represents the percent of the lung size (FVC) that can be exhaled in one second. A score of 70% or greater is normal, 60-69% shows mild abnormality, 50-59% shows moderate abnormality, and less than 50% shows severe abnormality. *Id.*

again advised to cease smoking. (*Id.*).

On January 22, 2013, Claimant saw Dr. Sheth for complaints of coughing, and she was diagnosed with an upper respiratory infection. (Tr. at 1124). Claimant's lungs were clear to auscultation with no audible rales or wheezes. (*Id.*). From April 29, 2013 through May 6, 2013, Claimant received treatment at Highland Health Center Substance Abuse Program where her diagnoses included opioid and nicotine dependence. (Tr. at 1128). She admitted to smoking two packs of cigarettes per day for the past 30 years. (*Id.*).

On January 31, 2014, Claimant was seen by John Ray, D.O., at MedExpress South Charleston. Claimant reported breathing issues, cough, and other concerns. (Tr. at 1283). She had no stridor; normal auscultation and/or percussion, respiration, rhythm, and depth; and normal respiratory effort without accessory muscle use. (Tr. at 1284). However, her breath sounds were decreased and she had wheezing, rhonchi, and crackles upon examination. (*Id.*). She was assessed to have, *inter alia*, pharyngitis, sore throat, shortness of breath, and acute sinusitis. (Tr. at 1285).

On March 5, 2014, Claimant followed up with her pulmonologist, Dr. Eggleston, in regard to her COPD.[6] (Tr. at 1201). She complained of worsening shortness of breath, cough, chest tightness, and wheezing, but no chest pain. (*Id.*). She admitted to still smoking four cigarettes per day, but stated that she was trying to quit. (*Id.*). Claimant did not have any decrease in normal daily activity. (*Id.*). On examination, her chest was normal in appearance with no retractions; her breathing was unlabored; and her chest was non-tender to palpation with normal vocal fremitus. (Tr. at 1202). She had

---

[6] The transcript of proceedings does not document any visits with Dr. Eggleston between April 11, 2012 and March 5, 2014.

diminished breath sounds and faint wheezing, but no rales or rhonchi. (*Id.*). Dr. Eggleston diagnosed Claimant with COPD, pneumonia, tobacco abuse, and chest pain. (Tr. at 1203). She was started on a Spiriva inhaler in addition to the Symbicort inhaler, advised to quit smoking, sent for a chest x-ray, and scheduled for a chest CT scan. (*Id.*). Her chest x-ray showed hyperexpansion that was consistent with COPD, but no acute infiltrates. (Tr. at 1195). Her CT scan taken on March 13, 2014, showed significant emphysema and a 5 millimeter left apical density that appeared to be a focal scar rather than a parenchymal nodule. (Tr. at 1196). It was suggested that Claimant have another CT scan in six months to ensure stability of the apical density. (*Id.*).

On April 10, 2014, Claimant saw Dr. Eggleston for follow up regarding her lung mass/nodule and COPD. She was currently feeling well and had no decrease in normal daily activity. (Tr. at 1197). However, she reported shortness of breath, cough, and wheezing, which was worse with exertion. (*Id.*). She stated that she could only walk up one-half of a flight of stairs. (*Id.*). She was smoking one-fourth of a pack of cigarettes per day. (Tr. at 1198). On examination, Claimant's chest was normal in appearance with no retractions; her breathing was unlabored; her chest was non-tender to palpation with normal vocal fremitus; and she had normal breath sounds with no rales, rhonchi, or wheezing. (*Id.*). However, Dr. Eggleston found that Claimant's spirometry test taken earlier that day again showed "severe obstruction." (Tr. at 1199). Her FVC score was less than 2.28 liters (less than 71% of predicted value) before administration of an albuterol inhaler and 2.64 liters (83% of predicted value) after administration of the drug. (Tr. at 1200). Her FEV1 scores were less than 1.21 liters (less than 48% of predicted value) pre-drug and less than 1.54 liters (less than 61% of predicted value) post-drug administration. (*Id.*). Her FEV1/FVC scores were less than 53 liters (less

than 66% of predicted value) pre-drug and less than 58 liters (less than 73% of predicted value) post-drug. (*Id.*). The assessment was COPD, pneumonia, and tobacco abuse. (*Id.*). Claimant was told to continue using her Spiriva and Symbicort inhalers, was prescribed the antibiotic Levaquin for acute bronchitis, and was instructed to return in five months. (*Id.*).

On May 31, 2014, Claimant saw Elaine Condono, D.O., at MedExpress South Charleston for back pain. During that visit, Claimant denied shortness of breath, and her chest was clear to auscultation bilaterally. (Tr. at 1290-91). Claimant saw Dr. Sheth the following month on June 9, 2014. Among other issues, she complained of symptoms of an upper respiratory infection. (Tr. at 1255). She reported a cough and chest tightness, but no chest pain. (*Id.*). Her lungs were clear to auscultation with unlabored breathing. (*Id.*). After admitting that she continued to smoke, Claimant was strongly counseled about the need for smoking cessation. (Tr. at 1255-56). She was prescribed the antibiotic Azithromycin for her upper respiratory infection. (Tr. at 1256). Later that year, on October 8, 2014, Claimant followed up with Michael M. Boustany, M.D., regarding a thyroid nodule. On that visit, her lungs were clear to auscultation with no rales, rhonchi, or wheezes. (Tr. at 1309).

On January 6, 2015, Claimant saw Alessandro Ambroz, M.D., at MedExpress South Charleston for a cough that persisted for four days. She denied shortness of breath and wheezing. (Tr. at 1296). She had normal breath sounds; no wheezing, crackles, stridor; her chest was normal in appearance and symmetrical; and she had normal respiration, rhythm, and depth. (*Id.*). However, diffuse rhonchi were noted on examination. (*Id.*). Claimant was diagnosed with acute bronchitis. (Tr. at 1297).

On January 12, 2015, Claimant was admitted to Charleston Area Medical

Center's Emergency Department with bronchitis, cough, and musculoskeletal complaints after she suffered a fall. (Tr. at 1216). She stated that she smoked one-half pack of cigarettes per day. (*Id.*). She had wheezing bilaterally and a cough, but equal breath sounds; good inspiratory and expiratory effort with unlabored breathing; and no rales, rhonchi, or retractions. (Tr. at 1217). Her chest x-ray showed no evidence of an acute cardiopulmonary process. (*Id.*). Her diagnoses included COPD and acute bronchitis. (Tr. at 1218). She was prescribed prednisone and advised to take Tylenol and Motrin as needed for pain. (*Id.*).

From January 18 through January 23, 2015, Claimant was admitted to Thomas Memorial Hospital, primarily for gastrointestinal complaints, but she was also treated for bronchitis. Her chest x-ray showed no acute disease and her lungs were clear to auscultation. (Tr. at 1223, 1233, 1321). The following month, on February 5, 2015, Claimant followed up with Dr. Sheth who noted Claimant's recent stay at Thomas Memorial Hospital "for acute bronchitis." (Tr. at 1260). Her lungs were clear to auscultation with no rales or wheezes. (*Id.*). She inquired about nicotine patches to help her quit smoking, indicating that they were not covered by Medicaid. (*Id.*).

On April 10, 2015, Claimant was admitted to Thomas Memorial Hospital for what was described as an accidental overdose of Seroquel and other medications. (Tr. at 1240, 1242, 1353). She denied chest pain, cough, or difficulty breathing, but her review of systems was stated to be unreliable at that time. (Tr. at 1240). Claimant reported smoking less than one-half pack of cigarettes per day. (*Id.*). She had normal breath sounds. (*Id.*). Her chest x-ray showed new mild bibasilar atelectasis or infiltrate as compared to her January 18, 2015 x-ray, as well as underlying chronic changes. (Tr. at 1360).

16

On April 13, 2015, when Claimant saw Michael Boustany, M.D. for irritable bowel syndrome, her lungs were clear on examination without rales. (Tr. at 607). Later that month, on April 21, 2015, Claimant saw Dr. Sheth and advised him that she was taken to Thomas Memorial Hospital by ambulance earlier that month and admitted for five days after "taking a pill from a friend and having a bad reaction." (Tr. at 1261). Dr. Sheth noted that Claimant's lab work in the hospital was positive for benzodiazepines, but she stated that she took a high dose of Seroquel, which "shut her down." (*Id.*). During Dr. Sheth's examination, Claimant's lungs were clear to auscultation with no rales or wheezes. (*Id.*).

### B. Evaluations and Opinions

On June 12, 2012, Claimant had an Internal Medicine Examination by Kip Beard, M.D., for the West Virginia Disability Determination Service. Claimant reported shortness of breath and chronic cough with wheezing. (Tr. at 724). She stated that she was currently out of her albuterol inhaler and nebulizer treatment, but she was still taking Symbicort. (*Id.*). She reported smoking less than a one-half pack of cigarettes per day. (*Id.*). On examination, Claimant had symmetrical chest excursion and breath sounds with no evidence of increased antiposterior diameter. (Tr. at 726). Her lung fields were clear without wheezes, rales, or rhonchi. (*Id.*). She had no prolonged expiratory phase, accessory muscle recruitment, or chest tenderness to palpation. (*Id.*).

Claimant's spirometry test performed by Dr. Beard on June 12, 2012 showed moderate COPD. (Tr. at 727, 729). Her best three FVC scores out of four attempts were 2.65 liters (94% of predicted value), 2.59 liters (92% of predicted value), and 2.53 liters (90% of predicted value). (Tr. at 729). Her three best FEV1 scores were 1.67 liters (71% of predicted value), 1.65 liters (70% of predicted value), and 1.61 liters (68% of

predicted value). (*Id.*). Finally, her three best FEV1/FVC scores were two scores of 0.63 (76% of predicted value) and one score of 0.64 (77% of predicted value). (*Id.*). She was not administered a bronchodilator for this test. (Tr. at 729-30).

On June 27, 2012, state agency expert, Subhash Gajendragadkar, M.D., assessed Claimant's physical RFC based upon a review of her records. Dr. Gajendragadkar opined that Claimant could occasionally lift or carry up to 25 pounds and frequently lift or carry up to 10 pounds. (Tr. at 158, 170). She could stand and/or walk with normal breaks for a total of six hours in an eight-hour work day and she could sit with normal breaks for a total of six hours in an eight-hour work day. (*Id.*). She could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; stoop; kneel; crouch; or crawl and could frequently balance. (*Id.*). Dr. Gajendragadkar also found environmental limitations, opining that Claimant should avoid even moderate exposure to temperature extremes, fumes, odors, dusts, gases, and poor ventilation and concentrated exposure to wetness, humidity, and hazards. (Tr. at 159, 171). A second agency expert, Dominic Gaziano, M.D., affirmed the RFC assessment at the reconsideration level of review on December 14, 2012. (Tr. at 187-88, 203-04).

During Claimant's psychological evaluation on March 7, 2014, Claimant reported that she had reduced her cigarette habit to one-half pack per day from her previous two packs per day. (Tr. at 1184). She stated that she could not breathe well and came down with pneumonia almost annually in recent years. (*Id.*). She reported that her mother died of "familial emphysema," but genetic testing showed that Claimant did not have the predisposition. (Tr. at 1184-85).

### C. Claimant's Statements

On December 27, 2011, Claimant completed an Adult Function Report. She

reported that her respiratory conditions limited her from working because she became "short of breath." (Tr. at 504). On a daily basis, she took her daughter to school, cleaned some around the house, and watched television. (Tr. at 505-06, 508). However, she stated that it took her longer to care for herself and perform daily activities due to shortness of breath and fatigue. (Tr. at 505-07). She also had difficulty cooking because she could not stand for long periods, and it was hard for her to pick things up while doing chores. (Tr. at 506-07). Her daughter assisted her with cooking, laundry, and grocery shopping. (Tr. at 506-07).

During her administrative hearing on August 26, 2015, Claimant testified that she became breathless after walking one-half block. (Tr. at 55). She could not finish washing dishes due to dyspnea and had to sit or lie down for two or three hours. (*Id.*). She stated that she was easily fatigued and required four or five breaks per day that lasted two to three hours; during that time, she usually lay down and watched television. (Tr. at 55, 61). She reported that she could prepare simple meals, but could not vacuum because the pushing and pulling "wears [her] out" and she could not go to the grocery store because it was too difficult for her to walk that distance. (Tr. at 55-56). She reiterated that her daughter had to vacuum and grocery shop for her. (Tr. at 56). As to her other physical capabilities, Claimant stated that she could lift a gallon of milk, but could not do so repetitively because she did not have the strength. (Tr. at 60).

Claimant testified that she stopped going to her pulmonologist in 2014 after watching her mother suffer and pass away from COPD; she stated that she was now "afraid to deal with it." (Tr. at 58). At the time of her hearing in August 2015, Claimant continued to smoke one-half pack of cigarettes per day. (Tr. at 58). She stated that she attempted to quit by using nicotine patches, but was unsuccessful. (Tr. at 58-59). She

testified that, during the day, she sometimes worked on crossword puzzles, used a nebulizer once every morning and evening that took 10 to 15 minutes each time, and gave herself a "puff" from an inhaler every two hours. (Tr. at 64-65).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

Claimant contends that the ALJ failed to properly analyze the severity of her COPD in finding that she had the RFC to perform a limited range of light work. (ECF No. 12 at 13). In particular, she argues that the ALJ focused on the moderate results of

Dr. Beard's June 12, 2012 pulmonary function test, but failed to consider the "more severe" results of Dr. Eggleston's subsequent April 10, 2014 test. (*Id.* At 13-14). Claimant states that this error was "especially egregious" because there was no opinion evidence in the file which considered the results of the latter 2014 test. (*Id.*). Claimant further argues that the ALJ failed to adequately consider the impact of her COPD on her ability to walk, lift, and carry. (*Id.* at 15).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1)

whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ noted Claimant's alleged limitations, including her reported shortness of breath after walking a short distance; her statement that she could lift a gallon of milk, but not repetitively; and her allegation that she required four or five breaks per day that lasted for two to three hours. (Tr. at 109). The ALJ thoroughly weighed the credibility of these and other allegations against the evidence of record.

22

The ALJ specifically recognized that Claimant's spirometry results by Dr. Eggleston in April 2012 showed "moderate to severe obstruction," the spirometry results taken by Dr. Beard in June 2012 showed "moderate COPD," and numerous x-rays and CT scans of Claimant's chest from June 2012 through March 2014 showed COPD and severe emphysema. (Tr. at 110).

However, the ALJ noted that while Claimant had some limitations due to COPD, the record did not support her allegations of disabling symptoms. The ALJ pointed out that Claimant continued to smoke against medical advice. (Tr. at 110-11). Further, despite her COPD, Claimant had no evidence of respiratory distress on examination in May 2012 or during Dr. Beard's June 2012 internal medicine examination. (Tr. at 110). The ALJ also stated that while Claimant had some wheezing in January 2013, her breath sounds were equal with good inspiratory and expiratory efforts, unlabored breathing, and no rales or rhonchi. (*Id.*). The ALJ noted that in 2014, Claimant followed up with Dr. Eggleston regarding her COPD after a two-year absence from treatment. (*Id.*). At that time, she had no decrease in normal daily activity and no chest pain, orthopnea, lower extremity edema, or fatigue. (*Id.*). She was advised to continue using her Symbicort and Spiriva inhalers and urged to quit smoking. (*Id.*). In addition, as noted by the ALJ, Claimant did not see a pulmonologist after 2014 and her records in 2015 showed that while she had mild bibasilar atelectasis or infiltrate and underlying chronic changes, her lungs were clear with no rales or wheezes. (Tr. at 109-10). In her later records from Dr. Sheth, Claimant did not voice complaints related to COPD. (Tr. at 110).

The ALJ also evaluated the opinion evidence, including the RFC assessments of the non-examining state medical experts, Drs. Gajendragadkar and Gaziano. (Tr. at

114). The ALJ gave partial weight to the state agency opinions "to the extent that they [were] consistent with the treatment notes, pulmonary function testing, and examinations." (*Id.*). However, the ALJ found that Claimant's ability to lift and carry weight and some of her postural and environmental limitations were more restricted than the foregoing experts determined. (Tr. at 109, 114).

Claimant contends that the ALJ erred in not citing Dr. Eggleston's 2014 pulmonary function report, which she argues showed "more severe" results than Dr. Beard's 2012 report of "moderate COPD." (ECF No. 12 at 13-14). However, Claimant's argument overlooks the fact that the ALJ did not rely exclusively on Dr. Beard's findings of moderate COPD, but also clearly discussed and relied on Dr. Eggleston's 2012 pulmonary function test. Dr. Eggleston's 2012 spirometry test rendered nearly identical results to Dr. Eggleston's 2014 test, which Claimant asserts the ALJ failed to consider.

As stated, the ALJ discussed in her decision that Claimant's 2012 spirometry test by Dr. Eggleston "showed moderate to severe obstruction" for which he prescribed a Symbicort inhaler and Claimant's 2012 spirometry test by Dr. Beard showed "moderate COPD." (Tr. at 110). A comparison of Claimant's 2012 and 2014 spirometry tests taken by Dr. Eggleston undermines Claimant's argument that the ALJ discounted more severe pulmonary function results by not mentioning the 2014 test. Her FVC scores were almost identical on both tests administered by Dr. Eggleston, falling in the lowest mild range of abnormality before administration of a bronchodilator and rising to the normal range after administration of the drug. (Tr. at 621, 1200). Similarly, her FEV1 scores were in the severe range in both tests. In contrast, her post-bronchodilator score on the 2014 test actually showed improvement over the 2012 test, rising to the

low moderate range. (*Id.*). Finally, Claimant's FEV1/FVC scores on both tests fell within the normal and mild range. (*Id.*).

Therefore, not only did the ALJ correctly summarize the results of Claimant's testing, stating that the results showed moderate to severe obstruction, but Claimant's FEV1 score, which is the only score which she cites in support of argument that the 2014 test showed more severe COPD, actually showed improvement in Dr. Eggleston's 2014 test as compared to his 2012 test.[7] As such, Claimant was not prejudiced in any way by the ALJ's failure to reference her 2014 test. Not only were the 2014 results nearly the same as the 2012 results obtained by Dr. Eggleston, but, if anything, Claimant's 2014 scores showed that her condition was more responsive to medication than it had been in 2012. Accordingly, there is no merit to Claimant's suggestion that a review of the 2014 scores would have altered the state experts' opinions or the ALJ's decision in any manner. Likewise, the ALJ did not err by relying on consultant's opinions that predated the 2014 pulmonary test, or by failing to request updated opinions, because there was no significant change in Claimant's condition in the ensuing years. *See Hampton v. Colvin*, No. 1:14-CV-24505, 2015 WL 5304294, at *21–22 (S.D. W. Va. Aug. 17, 2015), *report and recommendation adopted,* No. CV 1:14-24505, 2015 WL 5304292 (S.D. W. Va. Sept. 9, 2015) (finding that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations

---

[7] While Claimant's initial FEV1 score was slightly lower on the 2014 test (less than 48% of predicted value, as compared to less than 51% of predicted value in 2012), she showed more improvement after administration of a bronchodilator in 2014 than she did in 2012 (61% of predicted value as compared to less than 55% of predicted value in 2012). Notably, a score of 60% or above falls within the moderate range while below 60% is considered severe.

impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding' ... is an update to the report required.") (quoting *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 361 (3d Cir.2011)) (ellipses and brackets in original).

Moreover, simply because an ALJ does not cite a particular piece of evidence does not mean it was not considered. *Hart v. Colvin*, No. 3:14-CV-00169-FDW, 2015 WL 470448, at *6 (W.D.N.C. Feb. 4, 2015) ("However, the ALJ does not need to comment on every piece of evidence in the record, and the[] failure to cite a specific piece of evidence is not an indication that the evidence was not considered.") (citation omitted); *Vest v. Colvin*, No. 2:15-CV-05886, 2016 WL 5334668, at *8 (S.D. W. Va. Sept. 22, 2016) (An "ALJ is not required to discuss every piece of evidence, but only evidence which, 'if believed, could lead to a finding of disability.'") (citations omitted). In this case, the ALJ addressed conflicting evidence and provided substantial support for her RFC finding. The lack of reference to the 2014 pulmonary function test is no way alters that finding.

The undersigned next addresses Claimant's argument that the ALJ did not adequately consider the impact of her COPD on her ability to walk, lift, and carry. The undersigned also evaluates Claimant's related contention that if the ALJ properly considered Claimant's limitations in performing such functions, Claimant should have been limited to sedentary work. In the written decision, the ALJ explicitly acknowledged Claimant's allegations that COPD restricted her ability to walk, lift, and carry due to her symptoms of shortness of breath and fatigue. (Tr. at 109). However, as discussed, the ALJ found these allegations to be less than fully credible for numerous

reasons that she explained in the decision.[8] The ALJ noted that Claimant stopped seeing her pulmonologist after 2014, her treatment consisted only of a nebulizer and inhalers, and she continued to smoke one-half pack of cigarettes per day. (Tr. at 109). Further, despite her COPD, her lungs were clear to auscultation on examination in May 2012, June 2012, and January 2015. (Tr. at 110). While Claimant was wheezing during her treatment for bronchitis and a cough in January 2013, her breathing was symmetrical and unlabored without rales or rhonchi. (*Id.*). Finally, the ALJ stated that later in 2015, Claimant was voicing little to no respiratory complaints. (*Id.*).

Claimant does not cite any objective or opinion evidence regarding her ability to walk, lift, or carry that the ALJ purportedly overlooked. In addition to the treatment records and evaluations, the ALJ also reviewed the agency opinions and gave them partial weight. Indeed, based on her review of Claimant's treatment records and testing, the ALJ found that Claimant was slightly more restricted than the experts determined. (Tr. at 114). Other than self-serving testimony, which the ALJ addressed, there is no evidence in the file which substantiates that Claimant is more severely limited than the range of light work articulated by the ALJ.

Further, the ALJ's assessment is supported by substantial evidence in the file. Claimant's treatment records and tests document Claimant's COPD. (Tr. at 620, 621, 727, 729, 1195, 1199, 1203, 1218). However, despite her condition, Claimant's breathing was generally unlabored on examination and clear to auscultation with no rales, rhonchi, or wheezing. (Tr. at 607, 727, 741, 757, 781, 784, 1109, 1114, 1123, 1124, 1198, 1255, 1260, 1261, 1290-91, 1308). At limited times, Claimant exhibited diminished

---

[8] Claimant does not challenge the ALJ's credibility analysis.

breath sounds, some wheezing, and or rhonchi, but she was merely prescribed inhalers. (Tr. at 620, 1198, 1202-03, 1217, 1284, 1296). She was never placed on oxygen or referred for more aggressive treatment. Also, her respiratory symptoms often presented during bouts of upper respiratory infections that were treated with antibiotics. (*Id.*). Finally, as noted by the ALJ, Claimant continued to smoke cigarettes in direct contravention of medical advice.

The ALJ's RFC assessment is also consistent with the opinion evidence. As noted, the state agency experts found that Claimant had a RFC exceeding the limitations found by the ALJ. Claimant does not cite, nor can the undersigned find, evidence in the record subsequent to those evaluations which casts doubt on the ALJ's RFC finding. "Under the Social Security Act, [a reviewing court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." *Vest*, 2016 WL 5334668, at *2 (quoting *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001)) (alteration in original); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). The Court should not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary" and, if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the Court must defer to the Commissioner's decision. *Id.* (citations omitted).

The ALJ's decision demonstrates that she properly evaluated Claimant's allegations, medical treatment, and evaluations. The ALJ articulated support for her determination that is rooted in the record and consistent with the applicable rules and regulations. Therefore, for all of the reasons stated above, the undersigned **FINDS** that

the ALJ's assessment of Claimant's COPD and her RFC finding is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 12); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and

Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 21, 2017

Cheryl A. Eifert
United States Magistrate Judge